ECOLAB INC., Plaintiff,

v.

John PAOLO, Irwin Elliott, and South Nassau Control Corporation, Defendants.

No. CV–90–3386 (TCP).

United States District Court, E.D. New York.

Jan. 3, 1991.

Oppenheimer, Wolff & Donnelly by Herbert C. Ross, Jr., New York City, for plaintiff.

Richard G. Gertler, Massapequa, N.Y., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PLATT, Chief Judge.

The motion of plaintiff Ecolab Inc. for a preliminary injunction came before this Court for hearing on October 11, 1990. Evidence was introduced on behalf of all parties and the cause was argued and sub-mitted for decision. The Court, having considered the evidence heard and received on October 11, 12, 15, 17, and 18, 1990, and having considered the arguments of counsel and being fully advised, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

#### I. *Jurisdiction and Parties*

Plaintiff Ecolab Inc. ("Ecolab") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in St. Paul, Minnesota. (Donnelly aff. at ¶ 2).

Defendant John Paolo ("Paolo") is a citizen of the State of New York, residing in Patchogue, New York.

Defendant Irwin Elliott ("Elliott") is a citizen of the State of New York, residing in Hauppauge, New York. (T. 502).

Defendant South Nassau Control Corporation ("South Nassau") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located in Oceanside, New York. (T. 402, p. 1 of Exhibit to Klipper Aff.).

#### II. *Ecolab, Chemical Pioneer and the Industry*

Ecolab and its Chemical Pioneer division ("Chemical Pioneer") are both in the business of selling detergents and other cleaning products for dishwashing and laundry machines, and furnishing dispensing systems for commercial dishwashers and laundry machines, to customers in the hospitality industry (e.g. restaurants, caterers and hotels), and institutions such as hospitals and nursing homes. Chemical Pioneer is engaged also in the business of repairing and servicing dishwashing and laundry machines, and detergent dispensing systems. Ecolab conducts its business nationwide. Chemical Pioneer, which maintains its offices in Holbrook, New York, sells its products and services primarily in Nassau and Suffolk Counties. (T. 6–8).

On August 4, 1987, substantially all of the assets of Chemical Pioneer, Inc. (an

independent company and the predecessor of Ecolab's Chemical Pioneer division) were sold to Ecolab. Included among the assets sold were its customer list, which included the accounts Elliott had sold to Chemical Pioneer, Inc. and the good will of Chemical Pioneer, Inc. Five Hundred Thousand Dollars of the $1,500,000.00 purchase price for the assets was attributed to the customer list, and another $250,000.00 was designated for the purchase of the trade name and good will of Chemical Pioneer, Inc. (T. 206–9, 215–9).

Defendant South Nassau is engaged in the same business as, and is a competitor of, Ecolab and Ecolab's Chemical Pioneer division. (T. 75–7, 411).

III. *The Employment of Defendants Paolo and Elliott*

From 1985 to August 4, 1987, defendants Paolo and Elliott were employed by Chemical Pioneer, Inc. Prior to August 4, 1987, Chemical Pioneer, Inc. engaged in the same business as that in which Ecolab, the Chemical Pioneer division, and South Nassau are presently engaged. (T. 206–9).

When Elliott first became employed by Chemical Pioneer in 1985, he sold fourteen customer accounts and the associated good will to Chemical Pioneer, Inc. for approximately seventeen thousand dollars. Included among these customer accounts were the New Yorker Restaurant, TT's Landing (which has reopened under the name the Harbor Club), John Anthony's Restaurant, CoCo's, Huntington Hospital, and Baldwin Schools. (T. 208–9, 217–9, 512–3, 559, 580).

In 1988, Ecolab paid Paolo and Elliott total compensation of approximately $45,-000.00 and $50,000.00, respectively. In 1989, Ecolab paid Paolo and Elliott total compensation of approximately $44,000.00 and $43,000.00, respectively. In addition to compensation, Paolo and Elliott received from Ecolab $51.00 per week for expenses; health benefits, including major medical, hospital and dental coverage; and long and short term disability insurance. Ecolab also furnished each with the use of a company automobile and provided each with a non-contributory pension plan. (T. 42–45).

During Paolo's and Elliott's last year of employment with Ecolab, annual sales to the accounts assigned to Paolo were approximately $400,000.00, and annual sales to the accounts assigned to Elliott were approximately $500,000.00. (T. 59, 68).

IV. *The Employment Agreements*

On or about August 4, 1987, Paolo and Elliott each signed an employment agreement with Ecolab, as well as a document stating that each had received and read copies of Ecolab's Code of Conduct. Entering into the employment agreement was a condition of employment with Ecolab. However, Paolo and Elliott, as well as all others presented with the agreement, were permitted the opportunity to have an attorney review the agreement before signing. In their employment applications, both agreed to conform to Ecolab's rules and regulations. (T. 14–18, 26–27, 518–9, Pl. Exhibits 1–7).

The employment agreements signed by Paolo and Elliott each provided, at paragraph 5, that following termination of the employee's employment with Ecolab, the employee would not service, sell, solicit the sale of, or accept orders for products or services competitive with those of Ecolab to or from customers of Ecolab with whom the employee did business, whose accounts were assigned to the employee, or with regard to which the employee received commissions during the last twelve (12) months of the employee's employment with Ecolab, and would not assist others in such activities. (Pl. Exhibits 1–2).

Each of the employment agreements also provided:

"2. ... The Company will provide the Employee with special techniques and information, including CONFIDENTIAL INFORMATION, which the Company believes will be helpful and necessary to the performance of the Employee's duties. CONFIDENTIAL INFORMATION means information and trade secrets not generally known about the Company's business such as,

but not limited to, credit information on the Company's customers, customer route books, cards, or lists containing the names, addresses, buying habits and business locations of past, present and prospective customers, sales reports, service reports, price lists, product formulae and methods and procedures relating to services.

3. The Employee will not at any time, both during and after his employment by the Company, communicate or disclose to any person, firm or corporation, or use for his benefit or for the benefit of any other person, firm or corporation, directly or indirectly, any of the Company's CONFIDENTIAL INFORMATION acquired by the Employee while employed by the Company.

* * * * * *

6. Upon termination of his employment, the Employee will return in good order all customer information including route books, sales and service reports and recaps, sales and service manuals and literature, price books, samples, Company-issued tools, equipment and parts and any other written information in the Employee's possession, custody or control concerning customers, products or services of the Company...."

Upon signing of their employment agreements with Ecolab, Paolo and Elliott became territory managers of Ecolab's Chemical Pioneer division. This division was formed from the assets acquired by Ecolab from Chemical Pioneer, Inc.

V. *Information Received By Paolo and Elliott*

In the course of their employment with Ecolab, Paolo and Elliott were assigned various accounts. Upon being assigned new accounts, both were given records and other documents concerning the customers, including names and addresses of the accounts, the identity of the decision makers, and the dilution ratios for Chemical Pioneer products for the particular customers. Territory managers at Chemical Pioneer were and are responsible for servicing existing customer accounts, selling products to them, and soliciting new accounts. (T. 8–9, 28–30).

During the course of their employment, Ecolab issued to Paolo and Elliott and the other territory managers of Chemical Pioneer, five key sales reports on a monthly basis. The Chemical Pioneer district manager, Thomas Donnelly, discussed these reports with each territory manager each month. The reports given to each territory manager were: (1) the "new account productivity report," identifying the new accounts sold by the territory manager over a period of time and the monthly purchases in dollars of those accounts, (2) a "declining business report," identifying those accounts of the territory manager for which there had been a decline in business during the same period and showing monthly sales figures and a comparison of sales to the same account for the same period in the prior calendar year, (3) an "increasing business report" showing those accounts in which sales had increased over the same period, monthly sales figures, and a comparison to the same period during the prior calendar year, (4) the "no purchase report" identifying each account of the territory manager, which has made no purchases during the prior ninety days and comparing the purchases made by each such account over a period of the time with the purchases made by the same account during the same period in the prior calendar year, and (5) "sales summaries" showing the total sales in each account by name and month over the last twelve months and comparing sales to each account during a period of time with the sales to that account for the same period of time in the prior calendar year. (T. 299–302, Pl. Exhibits 17, 21, 26).

Ecolab also issued to Paolo and Elliott, as well as all other Chemical Pioneer territory managers, (1) "declining sales reports" showing the decline in purchases in dollars of specific Chemical Pioneer products in each account of the territory manager over a period of time and a comparison with the sales of such products to each account over the same products to each

account over the same period in the prior year, and (2) detailed reports, showing for each account of a territory manager the name and address of the account, outstanding invoices, the amount of time the invoices have been unpaid, and the amount of each invoice. (T. 302, 562–3, Pl. Exhibits 27 and 30).

Ecolab also furnished Paolo, Elliott, and the other territory managers at the Chemical Pioneer division with "account product detail reports" for each of their accounts. These reports related only to the customers of the manager receiving the report and detailed the particular products sold to the particular customer, the unit volume of each product sold to the customer, and the dollar volume of each product sold to the account over the last twelve months. (T. 296–7, 312–3, Defs. Exhibit B).

During their employment with the Chemical Pioneer division, Paolo and Elliott were also given, through their mail boxes at the offices of Chemical Pioneer on a regular basis, as territory managers a copy of each invoice sent to a customer which they were servicing. The territory managers were asked to pick up these invoices to keep track of their daily, weekly, and monthly sales. The invoices were to be returned to Ecolab upon termination of employment. (T. 88, 299).

Certain of this information was highly sensitive. If disclosed, Ecolab's price and individual customer discount information would allow competitors to undercut Ecolab. Furthermore, there was uncontroverted testimony that many buyers of institutional cleaning products are unsophisticated, knowing only that the service they receive is sufficient and the total amount they pay for cleaning products. This lack of sophistication increases the competitive significance of the information relating the exact amount and type of products purchased by each customer. Possession of such information would enable competitors to present Ecolab's customers with the sort of package bids, covering an entire year's requirements, to which customers in this industry are apparently most receptive. (T. 124–26).

## VI. *Treatment of the Customer Information*

As a condition of their employment with the Chemical Pioneer division of Ecolab, each employee must sign an employment agreement which prohibits the disclosure of confidential customer information. As outlined above, confidential customer information is defined to include customer lists, sales reports, and price lists. (T. 41–2, Pl. Exhibit 5 at p. 6). Moreover, upon departure from employment, Ecolab requires its employees to return all confidential customer information which they have received. This policy is embodied in a procedure, followed in this case, during which employees return the information to their supervisor. The supervisor checks off the various types of information returned and then the employee signs the checklist. (T. 159–78, 567–71).

This information was not made publicly available. It was distributed only to the sales force. The information was transmitted to them either through personal delivery, direct mail to their homes, or via intraoffice direct distributions. Salespeople received only information relevant to the customers they were servicing. Moreover, Ecolab also has a company policy against leaving price lists with customers, showing the prices for each of its products. (T. 36, 122, 295, 299, 302, 312–13).

Despite these precautions, however, three days after Paolo's discharge, Ecolab mailed to Paolo's home copies of invoices reflecting sales which he had made while still employed there. (T. 155–58, 388–92).

## VII. *Termination of Paolo and Elliott*

In December, 1989, and continuing thereafter, Thomas Donnelly, Chemical Pioneer District Manager and the supervisor of Paolo and Elliott, met with Paolo and Elliott individually and gave them written warnings as to their poor performance, including their failure to meet sales goals and budgets. (T. 46–51, 59–64, Pl. Exhibits 8–14).

By the end of July, 1990, Thomas Donnelly determined that Elliott's performance

had not improved. Donnelly met with Elliott and was about to terminate his employment. Elliott asked to be retained as an employee. Donnelly made inquiries and offered Elliott a position as a service technician, which would involve a reduction in compensation to $27,000.00. (T. 64–6, Pl. Exhibit 14).

Subsequent to his late July 1990 meeting with Elliott, Donnelly attempted to find Elliott a position as a service technician with the Eco Temp division of Ecolab, which would offer a $27,000.00 base salary, and a 2–½% commission, yielding total annual, estimated compensation of $35,000.00 for Elliott. Donnelly arranged for a meeting between Elliott and the local manager of the Eco Temp division on September 7, 1990. However, on September 10, 1990, Elliott resigned as an employee of Ecolab and rejected any new position with the company. (T. 66–8).

Thomas Donnelly terminated Paolo's employment with the Chemical Pioneer division on September 7, 1990. Paolo was dismissed for his repeated failures to achieve his sales budget combined with violations of Chemical Pioneer's prohibition against performing service work for personal gain during working hours. (T. 51–6, 296).

The Code of Conduct, a copy of which was furnished to Paolo at the commencement of his employment with Ecolab, prohibited such conduct at page 5 as follows:

"An employee may not engage in employment outside Ecolab if such employment competes with Ecolab, provides services or assistance to an Ecolab competitor, or interferes with the employee's assigned duties with Ecolab. Examples of such interference would be the requiring of Company time or facilities to perform the outside employment, or if the outside employment impairs the employee's ability to give full attention to his or her position with Ecolab during normal working hours."

Thomas Donnelly discovered one instance of Paolo performing repair services during Ecolab working hours for Paolo's personal gain. Frederick Bergmann, a territory manager of Ecolab's Chemical Pioneer division, witnessed an additional episode in which Paolo performed such services during his normal working hours. (T. 51–56, 321–2. Pl. Exhibit 5).

VIII. *Actions of Paolo and Elliott Immediately Following Their Termination*

When he terminated Paolo, Donnelly reminded him of the restrictive covenant in his employment agreement with Ecolab. Paolo stated that if his legal bills were paid by the company for which he was thinking of working, he would solicit the customers he had at Chemical Pioneer. Paolo telephoned Donnelly later that day and stated that he could solicit accounts which were transferred from him to other territory managers at Chemical Pioneer in early 1990. (T. 57–9).

Upon his termination at Ecolab, Paolo failed to return any reports, manuals, or documents whatsoever, including all copies of the five key reports and the account product detail report. Paolo did return some copies of invoices and bills of lading, which were not organized and simply thrown into a box. (T. 127–8, 148–52, 176–7, Defs. Exhibit E).

The customer data set forth in the account product detail reports furnished to Paolo, taken together with the sales summaries of June 30, 1990, the records of accounts transferred by him to others at the beginning of 1990, and the identities of the few accounts procured or assigned to Paolo between July 1, 1990 and his date of departure on September 7, 1990, less those whose last date of invoice from Ecolab was prior to September, 1989, would permit a reconstruction of all of Paolo's customer account information and activity in his last year of employment with Ecolab; what they purchased, how much they purchased and what they paid. (T. 308–9, Pl. Exhibits 17, 18, 19, 20 and Defs. Exhibit B).

On September 7, 1990, Frederick Bergmann, a territory manager of Ecolab's Chemical Pioneer division, was asked to give John Paolo a ride to his home after Paolo was dismissed as an employee. In early 1990, certain accounts which had

been serviced until then by Paolo for the Chemical Pioneer division were transferred to Frederick Bergmann.[1] Chemical Pioneer's territory managers receive in general a 6% commission on sales, and generally two-thirds or more of their compensation comes from commissions. In the course of the ride from Chemical Pioneer to Paolo's home, Paolo advised Bergmann that Bergmann stood to lose $100,000.00 in business. (T. 42, 185–7, 320–22, Pl. Exhibit 18 at 2d p.).

After his July meeting with Donnelly, Elliott met with a competitor of Chemical Pioneer, Unichem, to seek employment. Unichem's president asked what accounts Elliott could bring with him. Elliott listed the New Yorker Restaurant and the Harbor Club, accounts which he had sold to Chemical Pioneer, Inc. and had been servicing for Ecolab's Chemical Pioneer division. Elliott accepted Unichem's offer of employment, but remained in Ecolab's employ for a short while thereafter. (T. 531–2).

Elliott claimed to have returned some manuals to Ecolab, but admitted that he had retained in his home a box of invoices and cleaning manuals as well as various internal marketing memoranda circulated within Ecolab. Elliott signed two "institutional separation clearance summaries," one indicating that he had returned a "credit and collection binder" and claiming that he had never received certain manual or documents, and the other indicating that he returned nothing at all. He earlier gave his route book, but no manuals, brochures or lists, to William Canal, a territory manager in training. Elliott returned none of the sales or credit reports issued by Ecolab to him. (T. 127–8, 148–52, 160–1, 379–80, 567–70, Pl. Exhibit 41, Defs. Exhibit D).

## IX. *Meetings With South Nassau*

On September 10, 1990, Paolo met with Michael Klipper, President of South Nassau. According to Klipper, Elliott was also present. Klipper testified that on September 10, 1990, he asked Paolo and Elliott if they had restrictive covenants with Chemical Pioneer. Paolo gave Klipper a copy of his employment agreement with Ecolab. Klipper believed that Elliott had signed the same agreement. Klipper was aware that restrictive covenants in employment agreements were common in South Nassau's industry. Paolo signed an employment agreement with South Nassau within one week of September 10, 1990.[2] (T. 465–468).

Elliott testified that, on September 11, Paolo suggested that Elliott meet with Michael Klipper, President of South Nassau. Elliott met with Michael Klipper that afternoon. Klipper convinced him to reject employment with Unichem and accept employment with South Nassau. In the course of the discussion, Klipper asked Elliott what business he could bring with him. Elliott responded by referring to the New Yorker Restaurant, John Anthony's, and The Harbor Club accounts, which he had sold to Chemical Pioneer, Inc. in 1985. According to Elliott, he signed, that afternoon, an employment agreement with South Nassau with the same provision as Paolo's agreement with South Nassau. (T. 534–5, 573–4, 578–9, Pl. Exhibit 34).

Klipper testified that he saw Paolo and Elliott on the afternoon of September 10, 1990, and "enticed" Elliott to work for South Nassau rather than Unichem by increasing South Nassau's financial offer. He also testified that Paolo and Elliott would not be able to meet their draw from South Nassau if they could not solicit the accounts which they had at Chemical Pioneer. (T. 423–6, 474).

## X. *Contacts With Ecolab Customers Following Defendants' Termination*

### a. Paolo

On September 11, 1990, Frederick Bergmann and, later that day, Thomas Donnelly

---

**1.** In return, Paolo either received replacement accounts or additional compensation to his base salary pursuant to the "buy-back" provisions of Ecolab policy. The transferred customers constituted approximately $175,000.00 to $200,000.00 in annual sales.

**2.** This agreement contained terms relating to confidential information and future competition substantially similar to those in the Ecolab employment agreements. (T. 468–9, Pl. Exhibit 35).

of Ecolab's Chemical Pioneer division found Elliott and Paolo at Pier 44 Restaurant. Elliott advised Bergmann that he was "chauffeuring" Paolo. Paolo was dismantling Ecolab's detergent dispensing equipment in the restaurant and installing the equipment of a competitor, which turned out to be South Nassau. (T. 68–71, 323–7).

On September 12, 1990, Bergmann observed and photographed a South Nassau truck delivering dishwashing detergent to The Clam and Oyster Bar, which is under common ownership with Pier 44. Both of these restaurants had been Chemical Pioneer customers until September 11. They buy from the same vendor, and account for approximately $41,000 in annual sales. Neither restaurant purchases cleaning products from Ecolab any longer. Both had been accounts of Paolo during his last year of employment at Chemical Pioneer. (T. 327–31).

After becoming employed by South Nassau, Paolo sent a letter dated October 1, 1990, on South Nassau letterhead, to an International House of Pancakes ("IHOP") account which was part of a group of IHOP restaurants and another establishment, Imperial Manor, owned by three individuals. Along with the letter, Paolo sent copies of invoices to other accounts Paolo had during the last twelve months of his employment with Ecolab, showing that the IHOP restaurants and Imperial Manor had not received a discount which the other accounts had received from Chemical Pioneer. One of the angry owners contacted Richard Filby, a Chemical Pioneer territory manager, about this discrepancy in pricing which Paolo had brought to the owner's attention with the unreturned Chemical Pioneer invoices. (T. 86, 93–8, 472–3, Pl. Exhibits 23–25, 39).

Table Wraps, a laundry, was a customer of John Paolo during the last twelve months of his employment with Chemical Pioneer. Paolo had serviced the account up until January 1, 1990, when it was transferred to Elliott. On September 24, 1990, Chemical Pioneer employee William Canal found Paolo at Table Wraps. Paolo told Canal that he had just installed equip-

ment at the account for Paolo's new employer and Canal could pick up the Ecolab equipment which had been taken down. Subsequently, Canal found South Nassau products at the account. Table Wraps represents approximately $8,000.00 in annual sales. (T. 369–71, 601–02, Pl. Exhibit 21 at 1st p.).

On September 26, 1990, Canal and Donnelly found Paolo at John Anthony's restaurant. Paolo told Canal that Chemical Pioneer was losing John Anthony's account to Paolo, as well as two other accounts under the same ownership, Harbor Club and CoCo's, all of which had been serviced by Elliott during his last year of employment with Chemical Pioneer. Paolo advised Canal that he was employed as a manager for South Nassau and gave Canal his South Nassau business card. Paolo also advised that, on behalf of another competitor, Hadco, he had installed a dishwashing machine at Chateau La Mer, a Chemical Pioneer customer serviced by Elliott prior to his departure from Ecolab. (T. 371–374, Pl. Exhibit 22 at 2d p.).

On September 27, 1990, William Canal and Thomas Donnelly again found Paolo at John Anthony's Restaurant. Canal noticed that laundry cleaning products with the South Nassau name were being used in the laundry machines. They also noticed that Ecolab's equipment had been taken down and South Nassau dishwashing detergent dispensing equipment installed. The owner of John Anthony's permitted Canal and Donnelly to reinstall Chemical Pioneer equipment, but Paolo stated that he would have South Nassau's equipment back on the wall. (T. 72–7, 373–4, 376–7).

b. Elliott

On September 14, 1990, Elliott visited the New Yorker Restaurant, a customer which he had at Chemical Pioneer until August, 1990, and a Chemical Pioneer customer on September 14. He advised the owner that he was employed by South Nassau. After Elliott left, the owner told William Canal, a territory manager in training of the Chemical Pioneer division, that he was ceasing business with Chemical Pioneer and would

be purchasing competing products and services offered by Elliott. (T. 368–9, 583–5; see also: T. 399–400).

Shortly before resigning from his employment at Ecolab, Elliott telephoned John Anthony's Restaurant, an account which he serviced for Chemical Pioneer prior to August 1990. He advised the chef that he would be leaving Chemical Pioneer and that as soon as he had settled with a new company he would telephone the restaurant about its business. After his resignation from Ecolab, he telephoned the chef and advised him again that as soon as he was settled he would telephone and that in the event the restaurant was running short of material he would send detergents to the restaurant. On or about September 14, 1990, Elliott spoke with the general manager of John Anthony's, and advised him that he had left Chemical Pioneer and would provide cleaning chemicals from his new employer. At about the same time, Elliott visited Mr. Albicocco, the owner of John Anthony's, Harbor Club and CoCo's, all of which had been customers of Chemical Pioneer to that point and had been serviced by Mr. Elliott up to August, 1990. Elliott solicited the detergent business of these restaurants and advised Mr. Albicocco that he was employed by a new company. John Anthony's alone represents about $13,-000.00 in annual sales. (T. 585–590, Pl. Exhibit 21 at 1st p.).

Elliott and Paolo discussed installing dispensing equipment at John Anthony's for South Nassau. Paolo determined that it was important to install the equipment as quickly as possible and therefore installed equipment at that restaurant. Paolo went to John Anthony's because of Elliott's relationship with the restaurant, and Elliott was out on another call with Michael Klipper in New Jersey. (T. 588–592).

Rockville Links, a golf club, was an account that Elliott serviced at Chemical Pioneer until the beginning of 1990. In July 1990, prior to leaving Ecolab, Elliott spoke with the chef of Rockville Links, advised him that he would be leaving Ecolab soon and that when he settled with a new company he would call again. After becoming

employed with South Nassau, Elliott telephoned the chef and advised him that he would be working with South Nassau. He spoke again with Rockville Links on or about September 28, 1990, soliciting its business for South Nassau. Elliott wrote a letter to Rockville Links, dated October 1, 1990, again soliciting its detergent business for South Nassau. The second page of the letter was a price comparison between what Chemical Pioneer was charging Rockville Links and what South Nassau was offering for purportedly comparable products. Elliott testified that he knew the Chemical Pioneer prices partly as a result of his servicing the account at Chemical Pioneer. He claimed to have not mailed the letter, awaiting the outcome of the present action. (T. 592–7, Pl. Exhibit 36).

Hempstead Golf Club is a Chemical Pioneer account which Elliott had serviced within the last twelve months of his employment with Chemical Pioneer. Based on his experience with Chemical Pioneer he knew that the person to contact at that customer was Harry Quinn. In the middle of September, 1990, Elliott telephoned Mr. Quinn and told him that South Nassau could offer a better price for cleaning products than was being charged by Chemical Pioneer. In a letter dated October 1, 1990 to Quinn, Elliott stated that he was aware of the contract price and that South Nassau could do better. Elliott admitted that he was aware of the contract price charged by Chemical Pioneer to the Club, because he had serviced that account for Chemical Pioneer. Elliott claimed that this letter was not sent but retained. (T. 597–9, Pl. Exhibit 37).

Up until October 1, 1990, Elliott had been soliciting former customers that he had while he was employed by Chemical Pioneer, The New Yorker, John Anthony's, The Harbor Club, CoCo's, Rockville Links, and Hempstead Golf Club. Elliott testified that he believed that he was entitled to solicit these accounts despite the fact that he had sold these accounts in 1985 to Chemical Pioneer, Inc. (T. 577–8, 600–01).

### c. South Nassau

Elliott advised Michael Klipper, President of South Nassau, that he was communicating with the individual who owned John Anthony's, The Harbor Club, and CoCo's. Klipper knew that the New Yorker Restaurant had been a long time customer handled by Elliott. Paolo advised Klipper that he was going to solicit a former customer, LaGrange Inn. Indeed, Paolo produced a written solicitation directed to LaGrange Inn on South Nassau letterhead, dated September 19, 1990. (T. 589–591; T. 476; Pl. Exhibit 38).

Klipper never instructed Paolo or Elliott to stay away from former accounts. Even after Klipper received a letter on September 24, 1990 by telecopier from Ecolab's attorneys demanding that Paolo and Elliott cease solicitation of customers which they had done business during their last twelve months of employment with Ecolab and that South Nassau cease interfering with Paolo and Elliott's obligations to Ecolab, Klipper did not instruct them to cease such solicitations. South Nassau gave Paolo and Elliott support in soliciting any accounts, including furnishing sales materials, compensation and timely delivery of products and service. (T. 470–3, 476–9, 497, 590–591, Pl. Exhibits 38, 40).

Michael Klipper acknowledged that Elliott's letter to Rockville Links, with its listing of the prices charged by Ecolab/Chemical Pioneer for specific products sold to that account, was produced from South Nassau's files and that files concerning prospective customers are available to South Nassau's sales people. (T. 470, 478, Pl. Exhibit 36).

### XI. *Customers Covered by the Restrictive Covenants*

The customers of Chemical Pioneer with regard to which Paolo did business or for which he received commissions during the twelve months prior to his termination of employment with Ecolab are those listed on Exhibits 17 and 18, and those identified as Mr. Paolo's accounts on Exhibit 20 (i.e., Joey's Place, Millard Fillmore, Sunrise Executive Motel, and Excelsior Caterer) less those, other than Dunowitz & Lesser, listed on Exhibit 19 whose last invoice date from Ecolab is prior to September 7, 1989. (T. 305–8, 314–5, Pl. Exhibits 17–20, see also T. 138–9).

The customers of Chemical Pioneer with regard to which Elliott did business or for which he received commissions during the twelve months prior to termination of his employment with Ecolab are those listed on Exhibits 21 and 22, as well as those identified in Exhibit 20 as Elliott's accounts (i.e., Santa Fe Diner, Fu Ho, and Harbor Club) less those listed on Exhibit 19 whose last invoice from Ecolab was dated prior to September 10, 1989. (T. 305–6, 308, 314–5, Pl. Exhibits 20–22).

## Conclusions of Law

### I. *Jurisdiction*

This Court has subject matter jurisdiction of the action, pursuant to 28 U.S.C. § 1332, in that the plaintiff and the defendants are of diverse citizenship and the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs.

### II. *The Standard for a Preliminary Injunction*

Under prevailing Second Circuit law:

a preliminary injunction will be issued when there is a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons [Inc.]*, 596 F.2d 70, 72 (2d Cir.1979); *Roso-Lino Beverage Distributors, Inc. v. The Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d cir.1984); *Lamb's Chapel v. Center Moriches Union Free School District*, 736 F.Supp. 1247, 1250 (E.D.N.Y.1990).

A movant seeking to avail himself of the first alternative need not show that success is an absolute certainty. He need

only make a showing that the probability of his prevailing is better than fifty percent. · There may remain considerable room for doubt. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985). *See, Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953).

Where the movant can show that the balance of hardships tips strongly in his favor, the required showing of the probability of its success is reduced. "It is enough that 'the plaintiff's chances are better than negligible'". *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th cir.1986), *quoting, Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir.1984); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982).

### a. Irreparable Harm

Loss of good will constitutes irreparable harm which cannot be compensated by money damages. *Ecolab Inc. v. K.P. Laundry Machinery, Inc.*, 656 F.Supp. 894, 899 (S.D.N.Y.1987). The use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm. *Churchill Communications Corp. v. Demyanovich*, 668 F.Supp. 207, 214 (S.D.N.Y.1987); *Ecolab Inc. v. K.P. Laundry Machinery, Inc.*, 656 F.Supp. at 899, 900. If a plaintiff can secure legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm sufficient to warrant a preliminary injunction. *Wilson v. Illinois Southern Railway Co.*, 263 U.S. 574, 576–77, 44 S.Ct. 203, 204, 68 L.Ed. 456 (1924); *Galella v. Onassis*, 353 F.Supp. 196, 235 (S.D.N.Y.1972), *aff'd in part, rev'd in part on other grounds*, 487 F.2d 986 (2d Cir. 1973); Wright & Miller, Federal Practice and Procedure: Civil § 2944, p. 398.

Paolo's and Elliott's contacts with Chemical Pioneer's customers, and South Nassau's interference with Paolo's and Elliott's obligations to Ecolab have been persistent and continuing. Furthermore, the evidence presented at the hearing clearly shows that both Paolo and Elliott possess confidential customer information belonging to Ecolab and are intent upon using it to lure away Ecolab customers. Paolo sent copies of Ecolab invoices to an Ecolab customer in order to convince the customer that the discount Ecolab offered it was inadequate. Elliott composed a detailed price comparison for another Ecolab customer which he would certainly have sent had it not been for this Court's temporary restraining order. As the anger of the customer who received the copies of the invoices from Paolo indicates, Paolo's and Elliott's continued possession and use of this information threatens the customer good will currently enjoyed by Ecolab. Moreover, uncontroverted testimony indicates that certain Ecolab accounts at which Paolo and Elliott have engaged in competitive activities no longer purchase from Ecolab. Thus, the threat of customer loss has been convincingly established. Finally, if we were not to grant an injunction, Ecolab would be required to seek damages in many separate actions based upon each separate disclosure of the customer information. With all these facts in mind, this Court finds that Ecolab will suffer irreparable harm if Paolo and Elliott are not enjoined from the use and disclosure of the confidential customer information and from competitive activity in connection with certain Ecolab customers for the balance of this litigation.

### b. Likelihood of Success on the Merits

Under the laws of the State of New York, an employer has a "legitimate interest ... in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy." *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 308, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976). Accordingly, "restrictive covenants will be enforceable the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information [citations omitted]." *Id.* Such covenants must, however, also be reasonable in scope and duration. *Id. Business Intelligence*

*Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1071 (S.D.N.Y.1984).

An aggrieved plaintiff need not show that the information it seeks to protect is vital to its business, but only that the information would provide the unauthorized user of it with an unfair competitive advantage which it would not otherwise have enjoyed. *Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc.,* 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983). In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying. *Ferranti Elec., Inc. v. Harwood,* 43 Misc.2d 533, 251 N.Y.S.2d 612, 619–620 (Sup.Ct. Nassau County 1964). However, "[w]here a customer list constitutes a trade secret, it need not have been 'physically appropriated' in order to enjoin the departed employee from soliciting the plaintiff/employer's customers." *Velo–Bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y.1979).

■ Moreover, even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition. *Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.,* 135 A.D.2d 889, 522 N.Y.S.2d 287, 290 (3d Dep't 1987) ("an employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition"); *Allan Dampf, P.C. v. Bloom,* 127 A.D.2d 719, 512 N.Y.S.2d 116, 117 (2d Dep't 1987) (defendant engaged in unfair competition by misappropriation and exploitation of confidential information of former employer and improper use of information to solicit plaintiff's patients. Specifically, defendant copied a "recall list" of patients, containing names, addresses, telephone numbers, date of last appointment, date due for next check-up, and appropriated book containing names of patients defendant had treated, services

provided and fees paid.); *Continental Dynamics Corp. v. Kanter,* 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978) ("where customer lists do not rise to the level of trade secrets, an employee's 'physical taking' or 'studied copying' of such lists may, nevertheless, form the basis of a cause of action for unfair competition.").

### 1. *Paolo & Elliott*

■ The restrictive covenants in Paolo's and Elliott's employment agreements with Ecolab are reasonable in scope and duration. *Ecolab Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp. 894, 898 (S.D.N.Y.1987). These covenants do not unreasonably prohibit Paolo or Elliott from competing with Ecolab or unreasonably limit the geographical area in which they may compete. Essentially, the covenants merely prohibit former employee from competing or helping others to compete with Ecolab for the business of those customers of Ecolab whose accounts were assigned to him, with regard to which he received commissions or with whom the employee did business during the last twelve months of his employment with Ecolab. Elliott and Paolo may compete with Ecolab anywhere outside of Nassau and Suffolk Counties, where Ecolab's Chemical Pioneer does the vast majority of its business. Indeed, they may compete with Ecolab in Nassau and Suffolk counties so long as they do not attempt to pirate those accounts on which they worked or received commissions during their final year at Ecolab. Additionally, the duration of the covenant is reasonable, limited to one year from the termination of employment. *See id.*

■ Furthermore, certain portions of the information which Ecolab seeks to protect by enforcement of the restrictive covenants constitute trade secrets and, as such, are proper subjects of such contractual protection. In determining whether information constitutes a trade secret, the New York Courts have considered the following factors:

1) the extent to which the information is known outside of the business;

2) the extent to which it is known to employees and others involved in the business;

3) the extent of measures taken to guard the secrecy of the information;

4) the value of the information to the business and its competitors;

5) the amount of effort or money expended in developing the information;

6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Integrated Cash Management Services v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2nd Cir.1990); *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 803–04, 453 N.Y.S.2d 470, 472 (4th Dept.1982).

■ On balance, this Court feels that the price discount and product use and preference information which Ecolab provided to Paolo and Elliott constitute trade secrets under this test. The testimony showed that this information was not generally known outside of Ecolab and could not reliably be discovered from the customers themselves. Ecolab has clearly taken significant measures to assure that the information is not disclosed to competitors. Each employee must agree not to disclose such information as a condition of employment, each must return the information upon departure, and each is provided with only that information which is necessary to service the customers assigned to him. The fact that copies of a few invoices were sent to Paolo after his termination does not undermine the thrust of these efforts. This transmission was merely an isolated clerical oversight which does not compromise the company's otherwise thorough attempts to maintain the confidentiality of their customer information. Moreover, as his return of other invoices shows, Paolo was aware that Ecolab considered these documents confidential and that he was obligated to return them. Finally, the information was developed with considerable effort by Ecolab through the cultivation and monitoring of numerous customer accounts. The information relating to customer product preference and usage could not be developed by a competitor without a similar expenditure of effort. In the case of information relating to Ecolab discounts, this information could probably not be reliably developed by competitors at all. Thus, these forms of Ecolab customer information are proper subjects of protection by the restrictive covenants in Paolo's and Elliott's employment agreements.

Furthermore, such information when kept confidential by a company, has in the past been held to constitute a trade secret protectable by an injunction enforcing a restrictive covenant. *Support Systems Associates, Inc. v. Tavolacci*, 135 A.D.2d 704, 522 N.Y.S.2d 604, 605–606 (2d Dep't 1987) (employee's knowledge of pricing and cost information protectable by injunction since "if it were known to competitors, they would be in a position to underbid the [employer] and consequently win the contracts that [the employer] was competing for"); *Webcraft Technologies, Inc. v. McCaw*, 674 F.Supp. 1039, 1044–1047 (S.D. N.Y.1987) (customers' preference and employer's prices and pricing methods protectable); *Churchill Communications Corp. v. Demyanovich*, 668 F.Supp. 207, 211–12 (S.D.N.Y.1987) (pricing and volume information are protectable); *Ecolab Inc. v. K.P. Laundry Machinery, Inc., supra*, 656 F.Supp. at 898–899; *see also Giffords Oil, Inc. v. Wild*, 106 A.D.2d 610, 483 N.Y.S.2d 104, 106 (2d Dep't 1984) ("[I]nformation, such as fuel oil capacity of customers' tanks, and the amount certain customers were willing to pay, which aid plaintiffs in establishing prices and which could only be achieved through personal solicitation" protectable as confidential).

Moreover, even if this information did not independently rise to the level of a trade secret, Paolo's and Elliott's wrongful retention of the customer information would justify treating it as a trade secret. *See Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y.1979).

Paolo and Elliott were recipients of numerous Ecolab reports issued to them on a regular basis, containing specific information as to individual clients' price discounts, product preferences, and purchase histories. It is undisputed that Paolo and Elliott have returned virtually none of the infor-

mation provided to them by Ecolab. Although they may claim to have disposed of this information, their actions indicate that they have retained and are prepared to use at least some of it to compete with Ecolab. Thus, this Court concludes that the restrictive covenants in Paolo's and Paolo's employment contract are enforceable to prevent the use and disclosure of these trade secrets.

Furthermore, even if the information may not be regarded as a trade secret, Ecolab has made out an unfair competition claims against Paolo and Elliott. Ecolab clearly required its information and documents to be returned to it upon an employee's departure. As evidenced by his return of some invoices, Paolo clearly recognized this requirement and recognized that it applied to the invoices. Despite this, he retained at least some of these invoices and has since used them to compete with Ecolab on at least one occasion. Elliott also returned virtually none of the documents given to him. In fact, he admitted retaining at least a box of such information in his basement. Moreover, his creation of the detailed price comparison which he provided to the Rockville Links establishment indicates that he is using at least some of this information in order to compete with his former employer. Their actions, therefore, constitute species of unfair competition and may also be enjoined on that basis. *Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889, 522 N.Y.S.2d 287, 290 (3d Dep't 1987); *Allan Dampf, P.C. v. Bloom*, 127 A.D.2d 719, 512 N.Y.S.2d 116, 117 (2d Dep't 1987); *Continental Dynamics Corp. v. Kanter*, 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978).

Additionally, as regards Elliott, "one who sells a business to another has a legal duty to refrain from acting to impair the 'good will' transferred to the purchaser in exchange for part of the purchase price." *Hyde Park Products Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316, 321, 491 N.Y.S.2d 302, 305, 480 N.E.2d 1084, 1087 (1985) (citations omitted). Specifically, the seller is precluded from approaching his former customers and attempting to regain their patronage after purporting to transfer the good will of the business to the purchaser. *Mohawk Maintenance Co., Inc. v. Kessler*, 52 N.Y.2d 276, 284, 437 N.Y.S.2d 646, 650, 419 N.E.2d 324, 328 (1981). Nor, may this prohibition be lifted after a "reasonable" time. *Id.* 437 N.Y.S.2d at 651, 419 N.E.2d at 329. Accordingly, Elliott has no right to solicit those accounts which he sold, along with the goodwill associated therewith, to Chemical Pioneer, Inc.

### 2. *South Nassau*

Under New York law, the elements of a claim for unlawful interference with contract, are (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, and (3) defendant's unjustified and intentional interference with that contract, resulting in damage to the plaintiff. *Israel v. Wood Dolson Co., Inc.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956); *S & S Hotel Ventures Limited Partnership v. 777 S.H. Corp.*, 108 A.D.2d 351, 489 N.Y.S.2d 478, 480 (1st Dept 1985); *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 541 (2d Cir.1989); *Ecolab Inc. v. K.P. Laundry Machinery, Inc., supra*, 656 F.Supp. at 897.

There is abundant evidence to support Ecolab's claim that South Nassau wrongfully interfered with Paolo's and Elliott's contractual obligations to Ecolab. First, the existence of Paolo's and Elliott's employment contracts is not disputed. Second, at the moment each entered the employ of South Nassau, the President of South Nassau had in his possession a copy of Paolo's employment agreement with Ecolab and understood that Elliott's agreement with Ecolab was identical. Furthermore, the President knew that restrictive covenants were common in the industry. Finally, Klipper knowingly sought to induce acts by Messrs. Paolo and Elliott which would violate the restrictive covenant. In interviewing Elliott, South Nassau's President asked Elliott what accounts Elliott could bring with him to South Nassau. Elliott mentioned accounts he had serviced in the last twelve months at Ecolab and which he had sold to Chemical Pioneer, Inc. in 1985. The President testi-

fied that he "enticed" Elliott to work for South Nassau rather than Unichem knowing that Elliott could not meet his draw at South Nassau unless he solicited his former Ecolab accounts. Upon commencement of his employment with South Nassau, Elliott advised South Nassau's President that he was soliciting what he regarded as long time accounts, and Klipper did not object to these efforts. Paolo also advised Klipper that he was soliciting a customer which he serviced at Ecolab and again, Klipper did not object. On September 24, 1990, counsel for Ecolab sent a letter to South Nassau by telecopier and next-day delivery with copies of the Ecolab employment agreements with Paolo and Elliott and demanded a cessation of the breaches. Nevertheless, Paolo and Elliott continued to solicit Chemical Pioneer accounts serviced by them during their last year of employment with Ecolab, and South Nassau's President admitted that he never advised Paolo or Elliott to cease solicitations of former customers. Thus, Ecolab has established a likelihood of success on the merits of its claim against South Nassau for unlawful interference with contracts.

In such a case, to prevent former employees from accomplishing indirectly what they may not do directly, such as revealing confidential information to a third party, and to prevent their new employer from profiting from the unlawful taking of confidential information, the new employer may be enjoined from attempting to use such confidential information and from soliciting the employee's former accounts. *E.g., Harry R. Defler Corp. v. Kleeman,* 19 A.D.2d 396, 243 N.Y.S.2d 930, 936 (4th Dep't 1963), *aff'd,* 19 N.Y.2d 694, 278 N.Y. S.2d 883, 225 N.E.2d 569 (1967).

### c. Balance of Hardships

Even assuming, *arguendo,* that Ecolab has merely shown sufficiently serious questions going to the merits and is required to prove that the balance of hardships tips decidedly in its favor, Ecolab has also met the second test in the Second Circuit for a preliminary injunction. The balance of hardships tips heavily in favor of Ecolab.

Ecolab's Chemical Pioneer division operates in a highly competitive and price sensitive marketplace. It employed Paolo and Elliott for three years, during which time it entrusted them with confidential information which is of significant competitive value to it and to other actors in the market. Following their termination, Paolo and Elliott have not only failed to return this information, they have used it to compete with Ecolab. South Nassau has knowingly acquiesced in their activities and retains at least some of this information in its files. If unrestrained, they will be able to use this information to disturb customer relationships which Ecolab has spent considerable time, effort and expense developing. Ecolab, in turn, would be forced to pursue many separate actions in order to obtain compensation for their actions.

On the other hand, the restrictive covenants at issue do not prohibit Paolo and Elliott working in the Long Island market. They only restrict sales calls for one year and exclude only those customers with whom each did business or with respect to which each was compensated during the twelve months prior to termination of his employment with Ecolab. Otherwise, the Long Island market remains open to them. Also, because Paolo, Elliott and South Nassau may have no legitimate claim to the use of such information, enforcement of the covenant against the use of Chemical Pioneer's confidential customer information which has been and will be used by defendants to compete unfairly for its customers causes them no hardship. Finally, although it may not solicit customers of Ecolab, South Nassau remains free to service its customers and to compete vigorously for the remaining customers in the market.

### III. *Conclusion*

■ Ecolab, thus, has established a) that it will suffer irreparable harm without a preliminary injunction, and b) a likelihood of success on the merits of its claims. Furthermore, even if plaintiff had not established a likelihood of success, it has clearly established sufficiently serious questions going to the merits of its claims to make

them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. Therefore, plaintiff is entitled to a preliminary injunction.

Defendant South Nassau has already employed Paolo and Elliott for four months, has during that period improperly gained four customer accounts, Pier–44, Clam and Oyster Bar, The New Yorker Restaurant and Table Wraps, and has had access to the confidential customer information taken by Paolo and Elliott. Protection against the use of that confidential information requires that South Nassau also be enjoined from soliciting the customers serviced by Paolo or Elliott during the last year of their employment with Ecolab.

Defendants Paolo, Elliott, and South Nassau, and all officers, agents, servants, employees and attorneys of defendants, and all persons in active concert or participation with them, or any of them, who receive actual notice of the preliminary injunction by personal service or otherwise, during the pendency of this action, should be enjoined from:

(1) servicing, selling, soliciting the sale of, or accepting orders for products or services competitive with those of plaintiff to or from customers of plaintiff with whom defendants Paolo or Elliott did business, whose accounts were assigned to either of them, or with regard to which either received commissions during the last twelve months of their employment with plaintiff, and from assisting others in such activities; and

(2) disclosing, including the disclosure, or using for their own benefit or that of any other person, firm, or corporation any confidential information of plaintiff, acquired by defendants Paolo or Elliott while employed by plaintiff.

All defendants are also ordered to return to Ecolab all sales and credit reports of Ecolab, invoices and other documents setting forth confidential customer information of Ecolab and all copies or abstracts made from such reports and documents, as well as all product, training, and service manuals of Ecolab which are currently in their possession or control.

SO ORDERED.