H & R INDUSTRIES, INC. d/b/a
Northeast Plumbing Specialties
and Wayne Reed, Plaintiffs,

v.

Alvin KIRSHNER, individually and d/b/a
East Side Plumbing Specialties,
Defendants.

No. 92–CV–1282(TCP).

United States District Court,
Eastern District New York.

Aug. 22, 1995.

Joseph J. Ortego, Josh H. Kardisch, Rivkin, Radler & Kremer, Uniondale, NY, for H & R Industries, Inc., Wayne Reed.

Louis Brevetti, New York City, for Alvin Kirshner.

*MEMORANDUM AND ORDER*

PLATT, Judge.

Defendant Alvin Kirshner individually and d/b/a East Side Plumbing Specialties (collec-

tively "defendant") moved for summary judgment in this action. This case subsequently was transferred by random selection to Judge John Gleeson, but having heard oral argument, this Court has retained jurisdiction over the case for the purposes of determining this motion only. Plaintiffs allege that defendants violated the Lanham Trademark Act, 15 U.S.C. 1125, *et seq.*, as well as New York State law including (a) diversion of corporate opportunity; (b) unfair competition; (c) breach of fiduciary duties; (d) fraud and misrepresentation concerning the nature and characteristics of plaintiff's services; (e) tortious interference with business relations; and, (f) defamation of plaintiff Wayne Reed. For the reasons discussed below, defendant's motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND

Plaintiff H & R Industries, Inc. ("H & R") was formed in 1978 by two brothers, Herbert and Alvin Kirshner. H & R sells and distributes plumbing repair and replacement parts and similar equipment to building managers, superintendents, management companies and others in the New York metropolitan area under the name Northeast Plumbing Specialists ("Northeast"). Northeast's principal place of business is Great Neck, New York.

There are three shareholders of Northeast: Herbert and Alvin Kirshner who each own 40%, and plaintiff Wayne Reed, an officer and principal salesman, who owns 20% of this company. Until November 10, 1989, when he was removed by the Board of Directors, Alvin Kirshner ("defendant") also was a director and officer of H & R. He remains, however, a shareholder of H & R.

In 1984, with the assistance of his brother Herbert and approximately $30,000.00 in a line of credit from H & R, defendant opened East Side Plumbing Specialties Corporation ("East Side") in Manhattan. Alvin Kirshner is an officer, director and a 90% shareholder of East Side. Like H & R, East Side is in the business of selling plumbing supply parts and equipment.

*Competition Between the Parties*

A central dispute in this action is whether or not, or to what extent, the parties involved expected East Side to compete with H & R. Plaintiffs claim that they helped Alvin Kirshner open East Side as a retail plumbing supply store. They contend that the reason they helped Alvin Kirshner is because they wanted to see him succeed, and they relied upon his assurances that he did not intend to use or develop East Side into a competing venture that would sell plumbing supply parts in volume.

Plaintiffs claim that more than once prior to November 10, 1989 they confronted Alvin Kirshner with their suspicions that he was competing with H & R, but each time defendant assured them that he was not. Finally, in 1989 they learned that defendant had misrepresented himself to H & R's computer consultant and catalogue publisher to gain access to Northeast's confidential information and price lists. The Board of Directors subsequently removed him on November 10, 1989. Plaintiffs claim that defendant continued to engage in these types of activities even after being removed from the Board.

Defendant, on the other hand, argues that as early as 1984, the year East Side commenced operating, plaintiffs knew that East Side was competing with them by soliciting Northeast's customers. According to defendant, Herbert Kirshner admitted to knowing that between 1984 and 1989 Alvin Kirshner was soliciting H & R's clients. He also claims that plaintiff Wayne Reed admitted in his deposition that he learned in 1984 that one of H & R's larger customers, the "Schwab House" had given all of its business to East Side because it offered lower prices than H & R. Reed also stated that he learned that Alvin Kirshner was "going to [Northeast's] accounts and selling them." He claims that he spoke to Herbert Kirshner about these activities several times between early 1988 and November 10, 1989 but nothing was ever done. Finally, defendant claims that plaintiffs never demanded of Alvin Kirshner that these activities cease.

*Trade Secrets*

The second major factual dispute between the parties is whether or not information about H & R was confidential trade secrets. The parties also dispute how Alvin Kirshner

came to possess the information over the years.

It is undisputed that Alvin Kirshner was a director and officer of H & R until November 10, 1989. For some period prior to that time, he was provided with or was permitted access to customer lists, pricing information, distribution lists, inventory lists business development and marketing plans.

Plaintiffs claim that the only information "given" to defendant was monthly sales reports, and then only until 1983. Moreover, whatever information defendant had, it was confidential, proprietary, contained trade secrets, was necessary to Northeast's competitive advantage in the marketplace, and most importantly, it was given to defendant in his position as a director and officer. Similarly, plaintiffs contend, any such information was given to its employees, officers and independent contractors with the understanding that it was confidential.

Defendant argues that none of the information was confidential or contained trade secrets. He claims that he was given freely all price lists, monthly sales and commission reports between approximately 1979 until the end of 1983. For instance, at the time defendant established East Side, Herbert Kirshner gave him a complete price book and Northeast catalogs. Subsequently, East Side was billed for access to Northeast's price information which was provided until sometime in 1989.

Defendant also claims that plaintiffs had no customer list prior to the litigation.

Rather, defendant argues that "all of these customers are management companies that are publicly listed in telephone and other directories," and that H & R's business was generated by its salesmen who "knocked on doors." According to defendant, he was given a marked-up copy of Northeast's catalog in 1984, and later received copies of the catalogs from Northeast's dissatisfied customers. Finally, defendant claims that Northeast's price lists were given to all of its salesmen, and, it is further telling, that Northeast did not require any non-competition agreements from them.

According to both parties' versions of the facts, it appears that in 1989 East Side was essentially "cut off" by H & R. Plaintiffs assert that they became aware that East Side was competing with H & R, and that Alvin Kirshner was in possession of confidential price and customer information and was misrepresenting the origin of East Side's goods by telling H & R's customers that he and East Side were "one and the same" with H & R. Thus, it was in 1989 that H & R ceased selling to East Side its price information or any products at cost. It was also the year that Alvin Kirshner was removed from the Board of Directors.

*The Memorandum*

Plaintiffs also contend that on or about February 5, 1992 defendant helped prepare and publish a defamatory memorandum about plaintiff Wayne Reed, H & R's principal salesman and an officer of the company.[1]

---

**1.** *The full text of the memorandum is as follows:*

Building Managers beware! Strange things are happening to us in our industry.

Mr. Milstein, who owns Douglas Elliman and Milford Management (a company that manages Milford's residential buildings), has been using Milford Management people to accompany Douglas Elliman personnel to act as a policing arm for the purpose of entrapping you, They are using different excuses when arriving at your building.

A Douglas Elliman managing agent and a Milford employee arrive on payroll day and demand two pieces of information from each employee before they can get their paycheck.

A Douglas Elliman managing agent arrives at building with two Milford employees identifying themselves as stationary engineers. No basis for the visit is stated—no applicable violation cited—

no listing in the NYC Stationary Engineers' Registry listing these persons.

Men arrive at building and state they are from the elevator company to check out condition of elevators. When told they must supply identification they admit they are from Milford Management.

A Douglas Elliman agent and one Ed Lennon (an executive of Douglas Elliman) arrive at the building stating they're to conduct an inspection of housecleaning and to check your inventory. They inspect and supposedly prepare a report on housecleaning and your inventory as to how much you have and where purchased.

At other times, one Ms. Kate McCauley arrives with two men for re-inspection. The men identify themselves as Milford Management employees, but do not state their names. One of the two men that accompanied Ms. McCauley has been

They claim that the memorandum was distributed to local building managers and superintendents. The memorandum states generally that certain individuals were misrepresenting themselves as New York City Stationary Engineers and going to buildings purportedly to look for housecleaning violations or the condition of elevators, but actually for the purpose of checking the buildings' inventory as a way to generate sales. The memorandum further asserts that these individuals were attempting to "entrap" building managers and had harassed building employees. In addition to the description of Reed's involvement in the alleged scheme, the pertinent language of the memorandum that is alleged to have defamed Reed includes statements such as: " 'Wayne Reed' is willing to prostitute himself ....[it] is, to say the least, disgusting and reprehensible.... Wayne Reed, is setting you up; you're being spied upon!

Plaintiffs contend that the memorandum was a malicious attempt to destroy Reed's income and livelihood and that it caused H & R and Wayne Reed to lose customers and good will in the industry. They assert, *inter alia*, that the innuendoes within the memorandum are false and defamatory.

Defendant admits that he gave copies of the memorandum to at least two other people, Esat Skėpi and Sam Lamaj, but deny that he wrote, or participated in the preparation of the memorandum. Defendant argues that he did not know the author, but defendant believed the memorandum to be true because of conversations he had with a building manager named John Milne. Defendant also contends that he first saw the memorandum in 1990 when he received it in the mail, and gave a copy of it to Lamaj in 1991. Defendant does not state when a copy of the memorandum was given to Skepi or whether or not he distributed the memorandum in 1992 as plaintiffs contend.

identified as Mr. Wayne Reed, the president of Northeast Pluming Specialties, a Douglas Elliman vendor.

It has been learned that these so-called inspections and re-inspections are for the purpose of "catch you" in some imagined shortages of inventory. To think that a vendor, "Wayne Reed"

## II. *DISCUSSION*

### (a) *JURISDICTION*

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 1125, *et seq*, ("Lanham Trademark Act"). Accordingly, this Court exercises pendent jurisdiction over plaintiffs' State law claims pursuant to 28 U.S.C. § 1338(b) and § 1367.

### (b) *STANDARD OF REVIEW*

Defendant seeks summary judgment in their favor as to the federal and State claims brought by plaintiffs. Summary judgment is awarded when, as a matter of law, a party is entitled to judgment in its favor because there are no material facts in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). It is the movant's burden to establish a *prima facie* case demonstrating the absence of genuine issues of material fact. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once a *prima facie* case is made, the non-moving party must establish that a "rational trier of fact could find for the non-moving party or that there is a genuine issue for trial." *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989) (*quoting Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). Further, on a motion for summary judgment, a court is required to resolve all factual ambiguities in favor of the non-moving party. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992). Ultimately, however summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### (c) *FEDERAL CLAIMS*

Plaintiffs allege that defendant violated the Lanham Trademark Act 15 U.S.C. § 1125(a)

is willing to prostitute himself in order to gain some expected economic benefit by contriving shortages of inventory is, to say the least, disgusting and reprehensible.

Building Managers beware, Douglas Elliman, with the connivance of Wayne Reed, is setting you up; you're being spied upon!

(1982), as amended Nov. 16, 1988, when he made numerous oral and written misrepresentations to Northeast's clients by stating that Northeast was the origin of goods and services provided by East Side. Plaintiffs also allege that statements made in the memorandum concerning Wayne Reed constitute product disparagement in violation of the Act. Section 43(a) of the Lanham Act provides, in relevant part, that:

> [a]ny person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A)–(B); *see also PPX Enterprises Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 270 (2d Cir.1987) (stating that section 43(a) is regularly used to combat a variety of deceptive commercial practices). Thus, section 43(a) provides for two distinct causes of action: (a) false designation of origin or source, commonly known as "product infringement" claims and, (b) false description or representation, known as "false advertising" claims. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir. 1991). In this action plaintiffs claim that defendant's alleged statements that East Side and H & R were "one and the same" were false designation of the origin of its products. Plaintiff's claims based on the memorandum concerning amounts to trade disparagement, or a "false advertising" claim under the Lanham Act.

Defendant seeks summary judgment on the claims brought under the Lanham Act on the grounds that they are time barred and, in the alternative, they are unsupported by the evidence. In addition, defendant seeks summary judgment on the Lanham Act claims on the grounds the Court lacks jurisdiction over the claims where the alleged misrepresentations were not disseminated in interstate commerce. This Court will address these claims in turn.

### (1) *Statute of Limitations*

■ Defendant first seeks to dismiss the Lanham Act claims on the basis that they are not timely. Plaintiffs assert that this case is analogous to an action based on fraud, and that the relevant limitations period is six-years. N.Y.Civ.Prac.L. § 213(8) (McKinney's 1990). Arguing that a fraud analogy is inapplicable here because plaintiff has failed to allege scienter, defendant urges the Court to apply New York's three-year statute of limitations applicable to actions for tortious injury to property. N.Y.Civ.Prac. § 214(4) (McKinney's 1990). This determination is significant, for if this Court were to apply a three-year limitations period, it would bar any claims based on acts occurring more than three years before March 19, 1992, the date plaintiffs filed their initial complaint herein.

■ The Lanham Act itself does not proscribe a specific limitations period. *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 198 (S.D.N.Y.1984). Thus, this Court must look to analogous State law to determine the limitations period which does best to further the policies behind the Act. *Wilson v. Garcia*, 471 U.S. 261, 268, 105 S.Ct. 1938, 1942–43, 85 L.Ed.2d 254 (1985); *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521, 1528 (S.D.N.Y.1994); *PepsiCo*, 578 F.Supp. at 198. Accordingly, New York law will be analyzed.

The issue of which statute of limitations to apply to Lanham Act claims has been highly contested in the Courts of this Circuit. The analogy between a Lanham Act claim and common law fraud was first made in *Pepsi-*

*Co.* In *PepsiCo,* the Court reasoned that: "[Section 43(a) applies] to those deceptive practices which, like trademark infringement, attempt to induce consumers to purchase an advertiser's goods by falsely passing them off as the same as, or better than those of a competitor. Such claims can best be analogized to causes of action sounding in fraud." 578 F.Supp. at 199. Only once has a Court in this Circuit rejected the fraud analogy in favor of a tortious injury to property analysis. *See Construction Technology, Inc. v. Lockformer Company, Inc.,* 704 F.Supp. 1212, 1223 (S.D.N.Y.1989). The *PepsiCo* analysis was recently reaffirmed in *Gordon and Breach,* 859 F.Supp. at 1529 and again in *Calzaturificio Rangoni v. United States Shoe Corp.,* 868 F.Supp. 1414, 1420 (S.D.N.Y.1994). Thus, almost without fail, courts have found that New York's common law fraud action resembles the policy behind the Lanham Act.

■■■ The Lanham Trademark Act is remedial and it should be broadly construed. *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 125 (2d Cir.1984); *Allen v. National Video, Inc.,* 610 F.Supp. 612, 625 (S.D.N.Y.1985). According to section 45 of the Lanham Act, Congress intended the Act "to regulate commerce within [its] control . . . by making actionable the deceptive and misleading use of [registered] marks in such commerce; . . . [and] to protect persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127 (1982, Supp. 1994); *PepsiCo,* 578 F.Supp. at 199. Thus, the scope of the Act is not limited to protecting registered marks, but it also condemns misrepresentations regarding the origin of goods in commerce and other deceptive commercial practices. *See PPX Enterprises, Inc.,* 818 F.2d at 271–72; *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 91 n. 13 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985).

Further, it is the Lanham Act's policy proscribing deceptive trade practices and its language condemning acts which mislead consumers that makes scienter or the intent to defraud relevant to a section 43(a) violation. For instance the Act proscribes "any false designation of origin, false or misleading description of fact or false or misleading

representation of fact," which is likely to deceive a consumer as to the origin of the goods or services. *See* 15 U.S.C. 1125(a)(1)(A). This Court finds that the policies behind the Lanham Act most closely resemble New York common law fraud, and thus, the six-year statute of limitations will be applied.

Although the fraud analogy may not be a perfect fit, it has been resoundingly determined to be the "better fit" in this Circuit and elsewhere. *Gordon and Breach,* 859 F.Supp. at 1529; *Vitale v. Marlborough Gallery,* No. 93–Civ–6276, 1994 WL 654494 *6 (S.D.N.Y. July 5, 1994); *see also Unlimited Screw Products, Inc. v. Malm,* 781 F.Supp. 1121, 1125 (E.D.Va.1991) (finding that Virginia's statute of limitations for fraud most closely resembled the federal policy reflected in the Lanham Act); *Mylan Laboratories, Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446 (D.Md.1992) (rejecting argument that libel is analogous to Lanham Act claims and adopting the statute of limitations applicable to fraud and other torts), *rev'd on other grounds sub nom., Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir.1993), *cert. denied sub. nom., American Home Products Corp. v. Mylan Laboratories, Inc.,* — U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). Although this Court acknowledges the compelling questions raised in the *Lockformer* decision, *supra,* it may not ignore what appears to be the overwhelming law on this issue: a statute of limitations applicable in an action based on fraud is appropriate in Lanham Act claims.

*(2) Sufficiency of the Evidence:*

A. *False Designation of Origin Claim*

■ Plaintiffs seek a permanent injunction and $5,000,000.00 in damages for the alleged violations of the Lanham Act based on defendant's alleged false designation of the origin of East Side's products. The Lanham Act prescribes different standards depending upon the relief sought. In order to obtain injunctive relief "plaintiffs must demonstrate *a likelihood of* deception or confusion on the part of the buying public caused by the false description or representation." *PPX Enterprises,* 818 F.2d at 271 (emphasis added).

Thus, plaintiffs must provide facts which tend to establish that (1) it is the buying public that was confused or deceived, and (2) the misleading statement of the origin of the goods was *likely* to confuse or deceive, (not necessarily *actually* confuse or deceive) the buying public. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 170 (2d Cir.1991).

In contrast, to state a claim for damages under section 43(a) plaintiffs "must establish *actual* consumer confusion or deception resulting from the violation." *PPX Enterprises,* 818 F.2d at 271 (emphasis added). Subsequent to deciding *PPX Enterprises,* however, the Second Circuit recognized that proving customer confusion was difficult, and held that if a plaintiff is able to demonstrate that a defendant has intentionally acted to deceive the public as to the origin of the products, plaintiff need not provide evidence of actual consumer confusion. *Resource Developers,* 926 F.2d at 139–140. Under this analysis upon a proper showing of such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of customer confusion. *Id.* at 140; *see also George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1537 (2d Cir.1992) (such a showing gives rise to a rebuttable presumption of consumer confusion), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). Thus, if plaintiffs can show that defendant deliberately engaged in a deceptive commercial practice, this Court will presume that there was customer confusion unless defendant establishes otherwise.

A court is justified in presuming customer confusion particularly in the cases where a competitor had spent substantial funds in an effort to deceive customers and influence their purchasing decisions. *Resource Developers,* 926 F.2d at 140 (quoting *U–Haul International, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir.1986)); *see also Jaret International, Inc. v. Promotion In Motion, Inc.,* 826 F.Supp. 69, 74 (E.D.N.Y. 1993). Although the language of *Resource Developers* would appear to condemn all intentional acts to deceive the public, in practice courts consider only those acts, such as false designation of the origin of goods, that

are aimed at deceiving the consuming public. *See, e.g., id.,* 926 F.2d at 140 (stating that plaintiff "must demonstrate that Dettra set out to intentionally deceive flag purchasers"); *see also Johnson & Johnson*Merck v. Smithkline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992) (plaintiff must "demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, . . ."). Indeed, it is proper for courts to limit evidence of acts to meet the deliberate conduct requirement to those aimed at customers or potential customers where, after all, this showing is intended as a substitute for proving actual customer confusion in order to obtain damages.

In order to obtain summary judgment on the false designation of origin claims, defendant must establish that there are no issues of material fact which would tend to establish either the grounds for injunctive relief and/or damages.

Plaintiffs submit a sworn affidavit of Sam Lamaj, a building manager and previous customer of plaintiff, aimed at establishing that material issues of fact exist as to whether or not defendant set out to deceive its customers. According to Lamaj, Alvin Kirshner told him in 1990 that East Side was Northeast's Manhattan office and supply store and that Northeast's catalogue was also East Side's catalogue.

In the affidavit of Richard Webb, an employee of Plumlee Custom Publishing Company, the company that published plaintiffs' catalogues, he states that defendant told him in 1985 that East Side was the Manhattan showroom for Northeast. This statement may not be admissible at trial, for Plumlee is clearly not a customer of either Northeast or East Side. On the other hand, for purposes of this motion, it raises the issue of the types of statements Alvin Kirshner was making to persons involved in the wholesale plumbing industry. Similarly, the statements regarding Plumlee and its employees which are made in plaintiffs Herbert Kirshner and Wayne Reed's affidavits may not be admissible at trial, but raise issues of fact which bar summary judgment.

Kirshner's and Reed's affidavits also state that defendant made similar misrepresentations to various customers including Anne Fox and Esat Skepi, and Robert Gaffney. These statements are, however, inapplicable in determining whether or not Alvin Kirshner engaged in the requisite deliberate conduct where plaintiffs failed to submit affidavits from Fox, Skepi or Gaffney. Thus, their statements are hearsay and may not be used to oppose a summary judgment motion. *See* Fed.R.Civ.P. 56(e); *Jaret International,* 826 F.Supp. at 72–73 (quoting, *H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991)). Furthermore any statements by Gaffney may not be admissible at trial because by Kirshner's and Reed's own admissions, Gaffney, a computer consultant, was performing a service for H & R and like Webb and the Plumlee employees, Mr. Gaffney was not a customer of either H & R or East Side. Accordingly, the portions of Herbert Kirshner's and Reed's affidavits regarding Alvin Kirshner's statements to Fox, Skepi and Gaffney were not considered for purposes of this motion.

We are left then with the sworn statements of the one building manager, Sam Lamaj, and the Plumlee employee Richard Webb. A review of the relevant cases indicates that the conduct which has been deemed intentionally deceptive has been supported by evidence which is not provided here, and itself appeared more egregious. *See, e.g., PPX Enterprises,* 818 F.2d at 273 (allowing recovery of damages despite lack evidence of actual customer confusion where the products were "patently fraudulent, and the advertising accompanying those products was the vehicle employed to perpetrate the fraud"); *cf. Johnson & Johnson*Merck,* 960 F.2d at 299 (unwilling to extend the presumption of consumer confusion where evidence of deceptive intent in a false advertising claim was indirect and controverted). This Court advises plaintiffs that while this evidence may raise an issue of material fact, it is likely to be deemed insufficient to establish that defendant intended to deceive customers as required to obtain damages under the Lanham Act.

If plaintiffs fail to establish facts which satisfy its burden to show deliberate conduct, the Court will not presume that the consuming public has been confused as to the origin of East Side's goods. Therefore, it would be incumbent upon plaintiff to introduce evidence of actual customer confusion if it wants to make its case for damages. *Johnson & Johnson*Merck* at 299; *Resource Developers,* 926 F.2d at 140–41. It is apparent, however, that not even plaintiffs' affiant, Sam Lamaj, was confused by defendant's alleged statements, where he failed to aver that he bought any products from East Side as a result of being confused as to their origin. Webb was not a customer of plaintiff and therefore could not be confused, for purposes of the Lanham Act, as to the origin of the products. Furthermore, these facts also illustrate that injunctive relief may be inappropriate here, because facts refute the inference that there was a likelihood of confusion on the part of the buying public, where even plaintiffs affiant Lamaj was not confused.

Plaintiffs may face further difficulties, with regard to jurisdiction, if they intend to rely only upon the alleged statements made to Lamaj to establish their false designation of origin claims. It is understood that "[t]he Lanham Act's reach, while long, does not extend to the full outer limits of the commerce power." *Licata & Co., Inc. v. Goldberg,* 812 F.Supp. 403, 409 (S.D.N.Y. 1993). Rather, "[i]ts plain meaning ... reflects a legislative judgment that for the statute to apply, the questioned advertising or statements, and not merely the underlying commercial activity, must be disseminated in commerce." *Id.; see also Arrow United Industries v. Hugh Richards, Inc.,* 678 F.2d 410, 413 n. 5 (2d Cir.1982) ("Congress's expressed intent in passing the Lanham Act was, *inter alia,* 'to regulate commerce within the control of Congress.'") Without evidence to the contrary, the Court may find that defendant's alleged statements to Lamaj, a Manhattan building manager, were made entirely within New York. Even if the parties engaged in interstate commerce, or their business activities affected interstate commerce, the statements may not have been disseminated in commerce. Thus, the Lanham Act may well not apply in this instance,

but there appears to be enough to suggest that the motion for summary judgment should not be granted.

### B. *Trade Disparagement Claim*

█ Plaintiffs' trade disparagement claims rest on the memorandum concerning Wayne Reed in which plaintiffs allege that defendant commented and told H & R customers that Wayne Reed was engaging in improper commercial practices. In this regard, defendant's activities are said to amount to a violation of 15 U.S.C. § 1125(a)(1)(B). This section of the Lanham Act makes actionable "false or misleading representation of fact, which in *commercial advertising or promotion,* misrepresents the nature, characteristics, [or] qualities ... of another person's goods, services or commercial activities, ..." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). In the complaint, plaintiffs contend that the statements in the memorandum amount to misrepresentations about plaintiffs' services and that they were made in the context of promoting defendant Alvin Kirshner.

As amended in 1988, the Lanham Act reaches false statements made about a plaintiff's products or services, i.e. "commercial defamation," which is broader than the pre-amendment version of the Act which applied only to false statements about defendant's products or services. *National Artists Management Co., Inc. v. Weaving,* 769 F.Supp. 1224, 1229 (S.D.N.Y.1991). Indeed, prior to the amendments courts found trade disparagement activities non-actionable under 43(a). *See, e.g., Vidal Sassoon Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 278 (2d Cir. 1981); *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 415 (E.D.Pa.1983) (rejecting plaintiff's claim based on alleged false statements and representations about plaintiffs product). Courts generally approached disparagement claims reluctantly, such as when the *Zerpol* court stated "[u]nder [plaintiff's] interpretation, every state law disparagement action could be converted into a claim for violation of the Lanham Act.... Congress did not intend § 43(a) to encompass every undesirable business practice." *Id.* The courts' longstanding reluctance is re-

flected in section 1125(a)(1)(B), for as the plain language of the Act makes clear, to be actionable the false statements must be made in the context of commercial advertising or promotion used in connection with goods or services, or commercial activities. *Gordon & Breach,* 859 F.Supp. at 1532–33; *see also National Artists,* 769 F.Supp. at 1229.

There are few decisions of other courts following the amendments which have defined commercial advertising or promotion under the under section 1125(a)(1)(B). It is generally understood, however, that section 1125(a)(1)(B) " 'does not have boundless application ... but is limited to false advertising as that term is generally understood.' " *Gordon & Breach,* 859 F.Supp. at 1532 (quoting *Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2d Cir.1974)). When, as in the case here, the activity does not fall neatly into a paid advertising or promotional campaign category, courts have determined that statements which are alleged to be "advertising in effect" must be:

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; ... [and they] (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Gordon & Breach,* 859 F.Supp. at 1535–36 (summing up the "principles from the cases and legislative history").

In the Second Circuit, commercial speech is defined as " 'speech proposing a commercial transaction.' " *Gordon & Breach,* 859 F.Supp. at 1537; *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). In recognition that bright line rules are often unhelpful, the definition has been broadened to include speech which is "expression related solely to the economic interests of the speaker and its audience." *Gordon & Breach,* 859 F.Supp. at 1537 (quoting *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1505, 1513, 123 L.Ed.2d 99 (1993) (citation omitted)). For instance, where a statement links a product with a public issue, the state-

ment has been held to be commercial speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (pamphlets which discussed venereal disease and mentioned certain brands of condoms were commercial speech). Thus, there is no clear definition of commercial speech or promotion for purposes of the Lanham Act.

In an analogous case brought pursuant to section 1125(a) of the Lanham Act, *National Artists, supra,* the Court held that a series of telephone calls and statements made by defendants to plaintiff's clients amounted to false and misleading representations of fact concerning plaintiff's talent-booking services. 769 F.Supp. at 1235–36. In *National Artists,* defendants were a husband and wife, the wife having terminated her employment with plaintiffs. Both husband and wife admitted to contacting former customers and clients whom Mrs. Weaving served while in plaintiff's employ. The Court found that the calls were not only social, but also had commercial purposes where it was established that Mrs. Weaving and her husband had discussed alleged improprieties which forced her out of her job with plaintiff and the fact that she was planning to establish her own booking agency. *Id.* 769 F.Supp. at 1236.

In this regard, the memorandum could be considered to have a variety of purposes, some direct and others indirect, and still be deemed a form of trade disparagement under the Lanham Act. On its face, the memorandum accuses agents of Douglas Elliman, (a company to which Northeast sells products,) and Wayne Reed, of acting unscrupulously to determine whether or not they could sell products to a building. Only as an aside does the memorandum point out that Reed is the president of Northeast Plumbing Specialties. The memorandum makes no disparaging remarks directly towards Northeast nor does it even mention Northeast's services. Although it is not alleged by plaintiff, at best the memorandum accuses Douglas Elliman and Reed, and only by way of narrow association Northeast (H & R), of engaging in improper commercial practices.

On the other hand, where the law concerning commercial advertising or promotion in trade disparagement claims is not entirely

clear, this Court may not say with any degree of certainty that no material issues of fact exist with regard to whether or not the alleged statements amount to promotion within the meaning of section 1125(a)(1)(B). It must be left to a jury to decide whether or not the alleged use of the memorandum constituted trade disparagement in this particular industry under the Lanham Act.

### (4) *Laches*

Defendant argues that plaintiffs' Lanham Act claims are barred by laches. A defendant will prevail on a defense of laches where (a) plaintiff's delay in bringing a claim is unreasonable and inexcusable; and (b) the delay has resulted in material prejudice to the defendant. *Coleman v. Corning Glass Works,* 619 F.Supp. 950, 953 (W.D.N.Y.1985), *aff'd,* 818 F.2d 874 (Fed.Cir.1987); *Gasser Chair Co. Inc. v. Infanti Chair Manufacturing Corp.,* 21 U.S.P.Q.2d 1131, 1133 (E.D.N.Y.1991), *rev'd on other grounds,* 60 F.3d 770, 34 U.S.P.Q.2d 1822 (Fed.Cir.1995). The laches period commences when plaintiff discovers facts which form the basis of the claim. *Dixon v. American Telephone & Telegraph Company,* 159 F.2d 863, 864 (2d Cir.), *cert. denied,* 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 350 (1947); *Coleman,* 619 F.Supp. at 953. This Court finds that the doctrine of laches does not bar plaintiffs' claims because the delay, if any, was not inexcusable, and defendant has not shown how he has been prejudiced by such a delay.

There is a substantial factual dispute as to when and whether or not plaintiffs confronted Alvin Kirshner and demanded that he cease competing with H & R. Plaintiffs strongly contend that they spoke with Alvin Kirshner several times, and that each time he assured them that he was not using East Side to compete with H & R. Moreover, they argue, Alvin Kirshner was a member of the Board and Herbert Kirshner's brother, so they had reason to believe him. When prior notification in the form of warnings have been given to a suspected violator, courts have found that laches will not bar Lanham Act claims. For instance, in *Tanning Research Laboratories, Inc. v. Worldwide Import & Export Corp.,* 803 F.Supp.

606, 609–10 (E.D.N.Y.1992), the Court held that plaintiff's Lanham Act claims were not barred by laches where plaintiffs had sent letters to defendants notifying them of Lanham Act violations. Similarly, because there remain substantial issues of fact as to whether or not or when warnings were given to Alvin Kirshner, this Court may not adequately determine whether or not the length in time it took to file this action constitutes an inexcusable delay for laches purposes.

Furthermore, defendant only half-heartedly suggests that he has been prejudiced by plaintiffs' decision to wait until 1992 to file this case. His claim of prejudice, however, rests on the argument that East Side's business has since expanded. Normally, "[t]he expansion of an infringer's business is the kind of prejudice which will support the defense of laches." *Olympia Werke Aktiengesellschaft v. General Elec. Co.*, 545 F.Supp. 598, 614 (W.D.Va.1982), *aff'd*, 712 F.2d 74 (4th Cir.1983); *Coleman*, 619 F.Supp. at 955. In *Olympia* the court was presented with facts demonstrating "considerable prejudice" created by plaintiff's delays in bringing a patent infringement action where defendants had invested millions of dollars in research, development, equipment purchases, and marketing related to plaintiff's patented product. 545 F.Supp. at 614–15.

Defendant here merely states that while East Side's business had grown into a $1.2 million a year operation in 1991, sometime in the past plaintiff H & R had provided East Side with price lists and catalogs, and in between 1986 and 1989, plaintiff H & R sold East Side a total of $63,855 worth of plumbing supplies (and in 1989 only $1,696.00 worth of plumbing supplies) at cost. Thus, unlike in *Olympia*, here there was no great investment made by defendant that depended upon the assistance of H & R. *See also Lukens Steel Co. v. American Locomotive Co.*, 197 F.2d 939, 941 (2d Cir.1952) (laches defense available to patent infringer who "embarked on a costly expansion program").

As discussed above, plaintiffs initiated this action within the statute of limitations. Unlike the situation where a plaintiff fails to bring an action within the applicable limitations period, prejudice and delay are not presumed here. *See Coleman*, 619 F.Supp. at 953. Thus, where defendant has not met the burden to provide evidence of any prejudice, he has failed to establish a rebuttable presumption that plaintiffs are barred by laches from bringing this action.

Where issues of material fact exist as to plaintiffs' false designation of origin and trade disparagement claims, defendant's motion for summary judgment pursuant to the Lanham Act must be and is hereby denied.

#### (d) *STATE LAW CLAIMS*

Defendant moves for summary judgment on plaintiffs' State law claims sounding in unfair competition, breach of fiduciary duty, tortious interference with business relations, fraud and misrepresentation and defamation. Defendant also seeks summary judgment on plaintiffs' claims for punitive damages.

##### (1) *Diversion of Corporate Opportunity*

Plaintiffs claim that as part of defendant's plans to compete with Northeast Alvin Kirshner appropriated existing and prospective clients of plaintiffs. As part of this plan, defendant misappropriated plaintiffs' trade secrets and confidential materials without plaintiffs' consent. Defendant contends that the customer and price lists which are alleged to be trade secrets, are not trade secrets as a matter of law. In addition, defendant argues that this information was widely known among employees and/or easily accessible to anyone who was interested in the lists.

At this juncture, there remain various issues of material fact as to the nature of the alleged trade secrets, as well as how and when defendant acquired the information. In determining whether information constitutes a trade secret, the New York Courts have considered the following factors:

1) the extent to which the information is known outside of the business;

2) the extent to which it is known to employees and others involved in the business;

3) the extent of measures taken to guard the secrecy of the information;

4) the value of the information to the business and its competitors;

5) the amount of effort or money expended in developing the information;

6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Ecolab, Inc. v. Paolo,* 753 F.Supp. 1100, 1111–12 (E.D.N.Y.1991) (Platt, Ch.J.) (quoting *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990)). Indeed, each of these issues remain hotly contested by the parties. Moreover, even in *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 391–92, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972), cited by defendant in support of his argument that plaintiffs' customer lists are not trade secrets, the Court explicitly found, among other things, that the solicitation of plaintiffs' customers by a former employee was the product of memory or coincidence rather than a "physical taking or studied copying" of the lists. 29 N.Y.2d at 392, 328 N.Y.S.2d at 427, 278 N.E.2d at 639. Moreover, the Court found in *Leo Silfen* that a list of plaintiffs' customers was readily ascertainable. In the present case, not only are there issues of fact as to how Alvin Kirshner acquired customer lists over the years, but also how plaintiffs developed their own customer lists and whether, and to what degree, this information was available to the public, employees or to Alvin Kirshner himself.

Similarly, even if this Court were to determine that the customer and price lists were not trade secrets, depending upon how Alvin Kirshner came to possess them, his subsequent use of the lists could be enjoined as unfair competition. *Ecolab,* 753 F.Supp. at 1111; *Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.,* 135 A.D.2d 889, 891, 522 N.Y.S.2d 287, 290 (3d Dep't 1987) ("an employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition"); *Leo Silfen,* 29 N.Y.2d at 392, 328 N.Y.S.2d at 427, 278 N.E.2d at 639 (Wrongful or fraudulent tactics employed by defendant in soliciting plaintiff's customers may be enjoined as unfair competition and a court may award damages).

Therefore, the outstanding issues of fact surrounding the nature, acquisition and use by defendant of plaintiffs' alleged trade secrets bars summary judgment on the claim of diversion of corporate opportunity and, as will be discussed further, also bars summary judgment on the unfair competition claim.

(2) *Unfair Competition*

■ Under New York law, "the essence of unfair competition ... is 'the bad faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.* 728 F.Supp. 236, 249–50 (S.D.N.Y.) (citation omitted), *aff'd,* 923 F.2d 845 (2d Cir.1990). Thus, in order to succeed on their unfair competition claims, plaintiffs must demonstrate, in part, that there is a likelihood of confusion between their own and East Side's products. *See Coach Leatherware,* 933 F.2d at 169; *Kraft General Foods v. Allied Old English,* 831 F.Supp. 123, 135 (S.D.N.Y. 1993). Moreover, plaintiffs must establish some element of bad faith on the part of Alvin Kirshner. *See id.; Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). As discussed, *supra,* the Court must also find that defendant "misappropriated the labors and expenditures of another."

It remains an issue of fact whether or not Alvin Kirshner represented to plaintiffs' customers whether East Side and H & R were one and the same. For the reasons discussed herein, plaintiffs have sufficiently alleged that defendant acted in bad faith for the purposes of surviving this motion. Moreover, issues of fact remain as to whether defendant misappropriated trade secrets and confidential information from plaintiffs. Accordingly, summary judgment is denied on the issue of whether or not Alvin Kirshner engaged in unfair competition towards plaintiffs.

(3) *Breach of Fiduciary Duties*

Defendant has not challenged directly the sufficiency of the evidence underlying plaintiffs' cause of action for breach of fiduciary

duties. Therefore, this Court will not consider whether or not summary judgment is appropriate on this claim.

### (4) *Fraud and Misrepresentation*

■ Defendant contends that plaintiffs did not rely upon any false statements made by defendant Alvin Kirshner and that he is entitled to summary judgment on the claims of fraud and misrepresentation. Indeed, in the amended complaint it is only H & R's clients which are alleged to have relied upon the false and misleading statements about plaintiffs' products. It is axiomatic that plaintiffs must provide facts which support their contentions that they relied upon false and misleading statements to state a claim for fraud and misrepresentation. Apparently, the only statements upon which plaintiffs may have relied were Alvin Kirshner's alleged assertions to plaintiffs that he was not using East Side to compete with Northeast. These statements are not, however, the basis for plaintiffs' claims of fraud and misrepresentation. Therefore, summary judgment is granted in favor of defendant on plaintiffs' fifth cause of action for fraud and misrepresentation.

### (5) *Tortious Interference with Business Relations*

■ To establish a claim for tortious interference with business relations plaintiffs must show that defendant "interfered with business or economic relations between the plaintiff and a third party, either (1) with the *sole* purpose of harming the plaintiff; or (2) by dishonest, unfair or improper means." *Campo v. 1st Nationwide Bank*, 857 F.Supp. 264, 273 (E.D.N.Y.1994) (emphasis added); *PPX Enterprises*, 818 F.2d at 269. Thus, it is imperative for plaintiffs to establish that defendant engaged in fraudulent or criminal conduct, for even if the interference was intended, if defendant acted in part to advance his own interests the claim must fail. *Id.* at 269.

■ There is ample evidence that Alvin Kirshner acted with the intention, (perhaps sole intention), of advancing his own and East Side's interests over those of plaintiffs. As discussed above, however, it remains a central factual issue in this case whether or not defendant engaged in dishonest, unfair or improper activity to interfere with the business relationship between H & R and its customers. Thus, defendant's motion for summary judgment on this issue is denied.

### (6) *Defamation of Wayne Reed*

Plaintiffs contend that on or about February 2, 1992, Alvin Kirshner conspired and maliciously and willfully participated in a plan designed to defame Wayne Reed. The plan is alleged to have been the preparation and publication of the memorandum, *see* note 1 *supra*, aimed at Reed, Douglas Elliman and, indirectly, at Northeast and others. Defendant seeks summary judgment on this claim on the grounds that the memorandum is a statement of opinion and it is true. Defendant also argues that the defamation claim is time-barred.

■ A statement that is an expression of opinion is entitled to the absolute protection of the First Amendment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

> A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be 'pure opinion' if it does not imply that it is based upon undisclosed facts. . . . When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable.

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289, 508 N.Y.S.2d 901, 903–04, 501 N.E.2d 550, 552–53 (1986) (citations omitted).

■ The issue of whether a statement expresses fact or opinion is a question for the Court. *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985); *Steinhilber*, 68 N.Y.2d at 290, 508 N.Y.S.2d at 904, 501 N.E.2d at 553. In general, the Court should consider whether or not in the

entire context and circumstances of the communication the average person hearing or reading the memorandum would understand the memorandum to be a statement of fact or opinion. *Mr. Chow,* 759 F.2d at 226; If the statement is deemed an expression of opinion it is protected unless it implies that it is based upon undisclosed facts justifying the opinion. *Steinhilber,* 68 N.Y.2d at 290, 508 N.Y.S.2d at 904, 501 N.E.2d at 553; *Mr. Chow,* 759 F.2d at 226. In that case the statement may be actionable as a "mixed opinion." *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d at 904, 501 N.E.2d at 553.[2]

 New York has adopted the four-part test announced in *Ollman v. Evans, supra. Mr. Chow,* 759 F.2d at 226; *Coliniatis v. Dimas,* 848 F.Supp. 462, 468 (S.D.N.Y.1994). Under this test, the Court must analyze (1) the specific language at issue and whether it has a precise meaning which is readily understood or ambiguous; (2) whether the statement objectively may be characterized as true or false; (3) the circumstances and full context of the communication in which the statement is made; (4) the broad social context or setting surrounding the communication including the existence of any applicable customs or conventions which signal that the statement is an opinion. *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d at 905, 501 N.E.2d at 554. It is within this framework that we will analyze the memorandum.

 First, the memorandum begins with statements which, on their own, have very little to do with Wayne Reed. Only late in the text, after a description of the so-called "entrapment scheme" does the memorandum mention Wayne Reed's name, his affiliation with Northeast, and his alleged involvement in the scheme. Nevertheless, this language, which constitutes the majority of the memorandum, is written in unambiguous language and the description it gives is capable of being proven false. Therefore, under *Ollman* this language is deemed to be factual. *Coliniatis,* 848 F.Supp. at 469.

On the other hand, Following the paragraph that names Wayne Reed, the memorandum states:

> To think that a vendor, "Wayne Reed" is willing to prostitute himself in order to gain some expected economic benefit by contriving shortages of inventory is, to say the least, disgusting and reprehensible.

> Building Managers beware, Douglas Elliman, with the connivance of Wayne Reed, is setting you up; you're being spied upon!

In this Court's view these latter statements about Reed are intended to be expressions of the writer's (or writers') opinion. In some cases, where the writer's opinion follows the recitation of the facts upon which it is based, the communication is deemed "pure opinion" and it is non-actionable. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d at 903, 501 N.E.2d at 552. Where the facts themselves are alleged to be false, however, plaintiff may be able to recover damages for defamatory opinions where plaintiff demonstrates that the statements of fact are false and is able to "convince the triers of fact that the factual disparities would affect the conclusions drawn by the average reader regarding the validity of the opinions expressed." *Coliniatis,* 848 F.Supp. at 469 (quoting *Silsdorf v. Levine,* 59 N.Y.2d 8, 15–16, 462 N.Y.S.2d 822, 826, 449 N.E.2d 716, *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983)).

In their complaint, plaintiffs have not specifically alleged that the facts themselves are false, but they do claim that the memorandum itself is false and later that the "innuendoes" created by the statements are false. (Am.Compl. at ¶¶ 63, 68 and 69) *See Silsdorf,* 59 N.Y.2d at 14, 462 N.Y.S.2d at 825–26, 449 N.E.2d at 715–16 (where the facts upon which the opinion was based were alleged to be a "gross distortion" or "misrepresentation of fact" the trier of fact could find that statement was factual). Defendant argues that at his deposition, Reed admitted the facts in the memorandum and that therefore, they are true. At the deposition, however,

---

**2.** The memorandum is not actionable as a "mixed opinion" because there is no "implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Steinhilber,* 68 N.Y.2d at 290, 508 N.Y.S.2d at 904, 501 N.E.2d at 553. Nowhere in the memorandum does the writer allude to undisclosed facts concerning the alleged scheme.

on several occasions Reed disputed defendant's characterization of his activities as inspections. For instance, Reed stated: "He was telling people in the industry that we posed as inspectors. We didn't pose as inspectors. We were sent by the company [Douglas Elliman] to check inventory." (Reed Depo. at 128). In light of this factual dispute we are unable to say that the disparity would not affect the conclusions drawn by the average reader regarding the validity of the opinions expressed in the memorandum. These disparities also raise material issues of fact which the Court may not ignore, for as the United States Supreme Court stated in *Gertz,* "there is no constitutional value in false statements of fact." 418 U.S. at 340, 94 S.Ct. at 3007. Therefore, the issue of whether the factual statements describing the so called "entrapment" scheme are true or false is material, and for this reason summary judgment may not be granted on plaintiffs' defamation claim.

Furthermore, the Court must consider the context and circumstances in which the memorandum was written and distributed. Here, the memorandum is alleged to have been distributed to persons in the plumbing and building management industry, persons who presumably knew of Reed, Northeast and Douglas Elliman and who would be troubled by the information therein. It is also undisputed that the there was a less than amicable relationship between Alvin Kirshner and Reed at the time the memorandum is alleged to have been distributed. Thus, the Court may not overlook the suggestion that if the factual statements are untrue they were made for the purpose of injuring Wayne Reed professionally and personally. In particular, the memorandum identifies Reed as the only vendor involved in the scheme. It is only Reed whose conduct is said to be "disgusting and reprehensible." Therefore, in light of the circumstances and full context of the communication in which the statement was made summary judgment is inappropriate at this time.

Lastly, summary judgment is not appropriate on the grounds that the defamation claim is time barred. Plaintiffs allege that the memorandum was distributed as part of a scheme which commenced on February 5, 1992. The case was filed on March 19, 1992. Accordingly, plaintiffs' defamation claim was brought within the one-year statute of limitations prescribed by New York law. N.Y.Civ. P.L.R. § 215(3) (McKinney's 1990).

### (d) *ESTOPPEL AND ACQUIESCENCE*

■ Defendant argues that plaintiffs' State law claims based upon unfair competition, diversion of corporate opportunity, breach of fiduciary duty and tortious interference with business relations are barred by the doctrines of estoppel and acquiescence. Under the doctrines of estoppel and acquiescence:

> Where a person wronged is silent under a duty to speak, or by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself or so as to affect the rights or relations created by it between the wrongdoer and a third person, he acquiesces in and assents to it and is equitably estopped from impeaching it.

*Electrolux Corporation v. Val–Worth, Inc.,* 6 N.Y.2d 556, 564, 190 N.Y.S.2d 977, 983, 161 N.E.2d 197, 201 (1959) (citation omitted). First, it is highly disputed whether or not plaintiffs knew of, or the extent to which, East Side competed with Northeast. Plaintiffs maintain, among other things, that they confronted Alvin Kirshner with their suspicions of such but that he assured them that they were wrong. The parties dispute whether or not plaintiffs asked Alvin Kirshner to stop competing with Northeast, when plaintiffs learned about the competition and whether or not plaintiffs continued to help defendant despite knowing about the competition. Accordingly, summary judgment is inappropriate pursuant to the doctrines of estoppel and acquiescence.

### (e) *PUNITIVE DAMAGES*

■ Lastly, defendant seeks summary judgment on the issue of whether or not punitive damages are available to plaintiffs in this action. Defendant is correct in his assertions that punitive damages are inappropriate for violations of the Lanham Act. *Get-*

ty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 113 (2d Cir.1988) (adopting the view that § 35 is the exclusive provision for monetary damages for the entire Act, and holding that § 35 of the Act does not authorize punitive damages), cert. denied, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Thus, summary judgment is granted in favor of defendant on the issue of punitive damages based on violations of the Lanham Act.

On the other hand, punitive damages may be available for the pendent State claims. Plaintiffs have alleged that defendant acted wilfully in failing to uphold his fiduciary obligations as a director of H & R, thus, entitling plaintiffs to punitive damages for the violations of state law.

 Under New York law, damages are available when a defendant's conduct is wanton, willful or constitutes morally culpable conduct to an extreme degree. Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 371 (2d Cir.1988); Childress v. Taylor, 798 F.Supp. 981, 997 (S.D.N.Y.1992); Borkowski v. Borkowski, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976). Furthermore, the Second Circuit has held that punitive damages are available under New York law "where a wrong is aggravated by recklessness or willfulness, … whether or not directed against the public generally." Roy Export Co. v. Columbia Broadcasting System, 672 F.2d 1095, 1106 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 509 (2d Cir.1991). Moreover, New York recognizes that punitive damages may be appropriate for a private wrong where the parties' relationship was fiduciary or confidential in nature. Banque Indosuez v. Barclays Bank PLC, 181 A.D.2d 447, 580 N.Y.S.2d 765, 767 (1st Dep't 1992). Nevertheless, awards "must bear a reasonable relationship to a plaintiff's injury and defendant's malicious intent." Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 14 (2d Cir.1988), cert. denied, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989).

 Unlike claims based on the Lanham Act, under New York law, punitive damages may be awarded for the activities alleged in the complaint. See, e.g. Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d at 657; Roy Export Co., 672 F.2d at 1106; (unfair competition); Campo, supra, 857 F.Supp. at 274; Kubin v. Miller, 801 F.Supp. 1101, 1122 (S.D.N.Y.1992) (breach of fiduciary duty); Kelly v. L.L. Cool J., 145 F.R.D. 32, 38 (S.D.N.Y.1992), aff'd, 23 F.3d 398 (2d Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 365, 130 L.Ed.2d 318 (1994) (tortious interference with business relations); Kovacs v. Briarcliffe School, 208 A.D.2d 686, 688, 617 N.Y.S.2d 804, 806 (2d Dep't 1994) (defamation). Punitive damages may also be available for claims based upon diversion of corporate opportunity. See Wolff v. Wolff, 67 N.Y.2d 638, 641, 499 N.Y.S.2d 665, 667, 490 N.E.2d 532 (1986) (corporate officer found to have diverted corporate opportunity "may be accountable to for the fruits of his wrongdoing"). At this juncture, the Court finds that plaintiffs have adequately stated claims which, if proven, may entitle them to punitive damages. Moreover, where defendant has chosen to do little but fleetingly contest this point in his memorandum in support of this motion, they have done little to convince this Court otherwise.

On the other hand, because substantial issues of fact remain throughout the action, this Court refrains from determining further whether punitive damages are appropriate for the alleged New York State common law violation. Thus, summary judgment is denied as to plaintiff's request for punitive damages based on the State claims.

## IV. CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is granted in part and denied in part. Summary judgment must be and is hereby denied with regard to plaintiffs' claims pursuant to the Lanham Trademark Act, 15 U.S.C. 1125, et seq., as well as plaintiffs' State law claims for (a) diversion of corporate opportunity; (b) unfair competition; (c) breach of fiduciary duties; (d) tortious interference with business relations; (e) defamation of plaintiff Wayne Reed; and, (f) punitive damages. Summary judgment is granted, however, in

favor of defendant with regard to plaintiffs' (1) State law claims for fraud and misrepresentation and (2) their claims for punitive damages based upon alleged violations of the Lanham Act.

SO ORDERED.